In re SOLOWAY & KATZ.

(District Court, D. Connecticut, May 9, 1912.)

No. 2,743.

BANKRUPTCY (§ 238*)—BOOKS AND PAPERS—FAILURE TO PRODUCE—CONTEMPT.
   Facts *held* insufficient to show that bankrupts had intentionally withdrawn and concealed books and papers showing part of the history of their business, or were able to discover and produce the same to the trustee, and were therefore not punishable for contempt in failing to obey the referee's order requiring such production.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 406; Dec. Dig. § 238.*]

In the Matter of Soloway & Katz, bankrupts. Proceedings to punish the bankrupts for contempt in failing to obey a referee's order requiring them to produce certain missing books and papers for the benefit of the trustee. Respondents discharged.

J. P. Goodhart, of New Haven, Conn., for trustee.
De Forest & Klein, of Bridgeport, Conn., for bankrupts.

PLATT, District Judge. The orders of the referee, entered against each of the bankrupts, viz., Maurice Soloway and Samuel Katz, were found by me to be lawful in my decision (195 Fed. 103), upon a petition for a review of said orders, brought by said bankrupts severally. The opinion therein was filed February 10, 1912, and will speak for itself. The facts upon which the referee acted had been thoroughly presented to me when the petition for review was argued, and immediately after my decision the referee filed with the clerk his certificate again setting forth the whole situation by reference thereto. It then became my duty, under section 41b of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 556 [U. S. Comp. St. 1901, p. 3437]), to hear "in a summary manner" the evidence, and, if it should seem to me to warrant the action, to punish one or both of said bankrupts in the same manner and to the same extent as for a contempt committed before the court of bankruptcy. I have performed that duty by holding several sessions of the court, and listening with patience to all the testimony which the bankrupts and the trustee cared to present. I then gave the parties ample time to present their views as to the evidence, and their claims of law. They did so, quite exhaustively, and I am now, for the first time, able to give the matter the attention which it deserves. The facts pertinent to a decision herein have been studied with more care than the thoughtless will be apt to believe. I do not think it advisable to set them forth, in extenso, in this memorandum, which will be made intentionally brief. The outlines alone will be traced in.

The place of business occupied by the respondents at the time of this trouble is on Columbus avenue, not far from the railroad station, in the city of New Haven. It is a one-story building, consisting mainly of an immense storage room with ample facilities for trucking

goods in and out. On the street front of the structure a small room had been partitioned off from the main shed, which they used as an office. This was divided by another partition, leaving a small private office at its rear. The general office contained the usual accessories of such a business as they conducted; the ones of particular interest in this matter being a table several feet in length running part way through the office from front to rear, a small safe, a typewriter, and the usual folding business desk. Last fall the firm of Soloway & Katz became seriously involved financially. Attachments were placed upon the property and an officer took the whole plant into his possession, placing a keeper in charge. Business appears to have gone along about as freely with the keeper in charge as before. As troubles thickened, Mr. Soloway, who is plainly the master mind in the copartnership, consulted Benjamin Slade, Esq., a reputable attorney in New Haven, as to what he had better do. Mr. Slade advised him to find out what his assets and liabilities were, and to bring him a statement of them, from which it could be determined whether it would be better to attempt a settlement with the creditors or to go into bankruptcy. Certain creditors, being dissatisfied with the way in which things were going along under the keeper, insisted upon stricter control of the attached property, and for that purpose it was arranged by the sheriff that the first keeper, Mr. Rattner, should go, and a new keeper, Mr. Coogan, should be put in charge. This was to be done on or about October 25, 1911, and the respondents knew that it was to be done. They arranged to be at the office on the afternoon of October 25th to prepare the statement which Mr. Slade had asked for. They met between 3 and 4 o'clock in the afternoon at the office, and were there until along about 7 o'clock. Nobody else was there, except possibly the keeper, Rattner. All the books and papers of the firm which were needed to show their financial condition were on the long table in their large office. The books and papers which the referee has ordered to be produced were there with the others. Mr. Soloway, with Mr. Katz to assist him, drew off from the books, on sheets of paper, certain details of the information which Mr. Slade wanted. The missing things are a note book, a cash book, a purchase ledger, and October sales sheets. Mr. Soloway testifies that he used the note book at that time, drawing off from it onto a slip, all the notes and the names on them. He says that he did not use the purchase ledger, but copied off the purchases from a file of the bills, because the bookkeeper might have failed to post some of them, and he wanted to be as accurate as possible. He further says that he did not make use of the cash book or the October sales sheets. He admits, however, that all the missing articles were there at the time he and Katz were working on their statement. He says that in this way he drew off on sheets of paper what the firm owed, and, their time being short, he and Katz took the Waterbury and New Haven ledger, which would show their assets, and started for Mr. Slade's office about 7 o'clock, leaving the other papers and books in the office. Mr. Coogan took charge the next day, and the place was kept tightly closed from that time on. Later Mr. Chillingworth came in as tem-

porary receiver under bankruptcy proceedings, and the note book, cash book, and purchase ledger now missing could not be found. The trustee followed Mr. Chillingworth, and insists that the absence of these books has hampered him seriously in his efforts to get at the actual financial situation of the bankrupt estate. He goes so far as to say that he cannot arrive at the true inwardness of the muddled matter unless he has them.

The case is one of purely circumstantial evidence. On October 25th, at about 7 o'clock in the evening, these respondents, then foreseeing the probability of bankruptcy, had a chance to carry away from the creditors the information which the missing books contained. Since then there has been practically no chance for any one desiring to spirit them away to do so. There is no possibility that they have disappeared by accident, confusion, or mistake. If they are of great value to the creditors, and were not taken that night, they could only have been taken since by stealth, and there is no evidence to support such a conclusion. The exclusive opportunity to have the missing books under their control has been clearly shown in the case of each bankrupt. If there was nothing else to be considered, the final conclusion would be easily reached. But in truth we are now only on the threshold of the problem.

Was the motive for placing the note book, cash book, and purchase ledger beyond the reach of the creditors strong enough to impel either or both of the bankrupts to seize the chance that stood waiting for them as they left the office on the evening of October 25th? That is the turning point of the case. The testimony presented to me must leave my mind in such a condition that I am forced to answer that question in the affirmative. No doubt, for which a good reason can be given, as to the correctness of the answer, must exist. It is axiomatic that in studying the question of the force of the motive I must picture to myself, as best I can, the mind of each bankrupt as it was on the afternoon and evening of October 25th. Each bankrupt has stated to me, under oath, that as he sees it now the missing books would have been of little, if any, help to the creditors, if the trustee had found them when he went into possession. They had taken from the note book and from the bills themselves, a statement of what they owed, and the ledgers which show their assets were taken to Mr. Slade only to save time, and have been available to the trustee from the outset. If their transcript from the note book and from the bills was a fairly accurate one, there is great weight in what they say. The trustee has certainly been put to much trouble and expense in getting at the facts about the estate, but the bankrupts say that he now has all the information which the missing books could have given him. If this is so, and the trustee in a large measure concedes that it is, then the motive working on the minds of these respondents on October 25th would be greatly minimized. The thought in their minds would be, "If we carry off those three books, the creditors will be put to a lot of trouble and expense to get at the facts." We must also assume, in giving them even that much of a motive, that they were intentionally preparing a false statement of their liabilities to

take to the lawyer in whom they trusted. The statement of liabilities then drawn off has been used in the schedules. The bankrupts may have made trifling mistakes in copying, but it is unbelievable that they were deliberately preparing a false list in the circumstances which surrounded them on that October 25th. The assumption of a garbled statement and abstracted books forces one logically to suspect bad faith on the part of Mr. Slade, the attorney. I have known Mr. Slade too long and too well to entertain even the shadow of such a suspicion. He is an attorney of high standing and of absolute integrity. He has testified in this hearing, and, if he had any facts within his knowledge which would aid me in reaching a decision adverse to the respondents, he would have given them to me. And so, as I have said, the only motive which could have impelled the respondents to carry away the three missing books was the knowledge that their absence would bother the creditors. If they carried them away then for such a trifling reason, is the motive for refusing to obey the referee's order now any stronger? When the referee made his order, the respondents knew that the trustee, by the use of much effort and expense, was getting at the facts about the estate, and by further struggling might get at them all, and I am expected to believe that out of pure, unadulterated obstinacy, they are persistently refusing to bring back something which they have under their control, just to make the creditors more trouble and expense. I cannot imagine any bankrupt acting in such a way as that toward his creditors. It will be noticed that in my allusions to the property ordered to be brought back I have refrained from mentioning the October sales sheets. That part of the order deserves separate treatment.

The referee has ordered all the October sales sheets to be brought into court by each respondent. Now these sales sheets were in the office while the respondents were preparing these statements for Mr. Slade on October 25th. The facility for carrying them away with them was just as broad and open as the opportunity to remove the missing books. But it appears by the testimony that at the time when the referee ordered the respondents to produce the October sales sheets it had already been made known to him that the trustee was in possession of something like four-fifths of them. I cannot imagine what the mental process was which enabled the referee to order them to produce all these sheets, when he knew that they did not take and could not have taken the major portion of them. If the trustee had asserted and established the fact that the missing fifth of those sheets contained the information which he was seeking, and that without them he could not do his duty by the creditors, a legitimate basis for an inference that the respondents had carefully selected and removed the valuable sheets would have been established, but even then we would be far away from a situation which would leave no reasonable doubt existing as to either or both respondents having taken such action; and, further, the failure of the referee to reason closely and carefully, in the matter of the sales sheets, forces one to examine with extra pains the reasons which must have actuated his action about the missing books. As to the sales sheets, it cannot, of course,

be expected of any one, even the most sanguine, that I will enforce the order. Despite this feature of the case, if upon all the testimony, my mind were driven to the conclusion that the presence of the missing books is absolutely essential to an explanation of the great discrepancy which exists between the purchases of the firm and the stock of goods and cash on hand at the time of the bankruptcy, the motive which would exist in the minds of the respondents on October 25th becomes one of great force. But that is a conclusion which the testimony must force into my mind so that it pervades and possesses it absolutely, and to the exclusion of any lurking doubt for which a good reason can be given. It is conceded that the information drawn off on slips by the respondents on October 25th was afterwards used in making up the schedules which the bankrupts filed in court. No testimony has been presented to me which comes within shouting distance of establishing, beyond a reasonable doubt, that these schedules were grossly and intentionally inaccurate. Measured by the degree of proof needed, it goes no further than to show that some negligible error may have been made by the respondents when making up their list of liabilities on October 25th. There is really not enough to furnish even a reasonable suspicion that on that fateful afternoon and evening of October 25th the respondents concocted and executed a deep plot to remove from their office the only clue which could guide the trustee to the place where the goods or money, which have so mysteriously disappeared, can be found.

A thought crosses my mind at this moment which it may be well to fix in type before it escapes. It is a curious thing that, although the trustee protests with vigor that he cannot gather in the missing property unless he has the missing books, he has at this moment a petition on file with the referee in which he alleges that he has examined the bankrupts and has thoroughly investigated the books and papers of the bankrupts, which are under his control, and as the result thereof he believes that said bankrupts are fraudulently concealing a large amount of groceries and provisions and a large amount of cash, notes, securities, etc., amounting in value "to at least $30,-000." It would strike me that either his protestations in this contempt proceeding are extravagant, or that his petition just mentioned is unwarranted.

Here is another thought which will not down at my bidding. The testimony leaves the situation in the respondents' office when they left it about 7 o'clock on the evening of October 25th uncertain and vague, but, as well as I can read, it comes to this: The long office table appears to have been filled to overflowing with divers and various books and papers. The safe was not large enough to hold the important books and papers which were left on the table when the respondents departed on their way to Mr. Slade's office. But the next morning, when Coogan took charge, there was nothing of any account in sight in the office, and the safe was locked and the combination lost. After the bankrupts went away, it is not clear that no possible chance existed for any other person to put hands upon the missing books. Some hand touched the other contents of that table. Why must the

missing books be exempt from such touch? The subject is intensely interesting and my pencil runs on with almost human insistence, but I must stop. To recapitulate: That evening of October 25, 1911, was, as Soloway & Katz both knew, the last chance to carry away from their office any of their books and papers which would tend to explain their business dealings during the six months then just past. They could have taken the missing books away if they had wished to. They could not, and did not take away the October sales sheets. They went in company as far as the entrance to Mr. Slade's office. The missing books were not taken to Mr. Slade's office. Mr. Katz might have carried them along to some other place, and, if so, both respondents must know where they now are. The testimony, however, has not satisfied my mind that the missing books, if produced, would unearth and spread before, those interested the methods and details of the bankrupts' wrongdoings. I strongly suspect that no books will ever tell the story of the bankrupt estate in full. I am satisfied that the great discrepancies which certainly exist cannot be explained by carelessness or laxity of method. The orders, which I have found to be lawful, and which furnish the basis for this proceeding, came upon me as a surprise when I first saw them. On an earlier review I had overruled the referee. My natural desire for order and regularity led me at that time to go out of my way and indicate the methods which to me seemed most appropriate. My suggestions were ignored and a course pursued, which, although I have found it to be lawful, was certainly not within my thoughts when I decided the first review. The creditors' meeting on the bankrupt estate has been a long and hotly contested one. The trustee thinks it has been warranted. The bankrupts think that the proceedings smack of the Spanish inquisition. As I have studied the case, the last two thoughts, with all which they suggest, have been, to the best of my ability, banished from my mind.

The matter at issue should not be affected in either direction by them. I can only say that with the light given me I am clear that it would be a distinct violation of my sworn duty to order either of the respondents committed to prison, there to remain until he should comply with an order which I seriously doubt his ability to perform.

The respondents may be discharged.